IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TERRY L. MITCHELL, | ) | |
| | ) | 8:07CV16 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER ON |
| MICHAEL J. ASTRUE, | ) | REVIEW OF THE FINAL DECISION OF |
| Commissioner of the Social Security | ) | THE COMMISSIONER OF THE SOCIAL |
| Administration, | ) | SECURITY ADMINISTRATOR |
| | ) | |
| Defendant. | | |

Now before me is Plaintiff Terry Mitchell's complaint, filing 1, which is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The plaintiff seeks a review of the Commissioner of the Social Security Administration's decision to deny the plaintiff's applications for disability insurance benefits under Title II of the Social Security Act (the Act), see 42 U.S.C. §§ 401 et seq., and Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. The defendant has filed an answer to the complaint and a transcript of the administrative record. (See filings 8, 9.) In addition, the parties have filed briefs in support of their respective positions. (See Pl.'s Br., filing 11; Def.'s Br., filing 15; Pl.'s Reply Br., filing 16.) I have carefully reviewed these materials, and I find that the case must be remanded for further proceedings.

## I.   BACKGROUND

The plaintiff filed applications for disability insurance benefits and SSI benefits on November 4, 2002. (See Transcript of Social Security Proceedings, filing 9 (hereinafter "Tr."), at 120-23, 362-64.) It appears that these applications were denied on initial review, (see id. at 76, 80-83, 365-69), and that the plaintiff did not appeal these denials.

The plaintiff filed a second application for disability insurance benefits in April 2003. (See Tr. at 128-30.) This application was denied on initial review, (see id. at 77, 84-87), and,

1

once again, there is no indication that the plaintiff appealed this determination.

The plaintiff filed new applications for disability insurance benefits and SSI benefits on December 18, 2003.  (See Tr. at 125-27, 371-73.)  After these applications were denied initially, (see id. at 78, 89-92, 374-78) and on reconsideration, (see id. at 79, 96-102, 379-84), the plaintiff requested a hearing before an Administrative Law Judge (ALJ), (see id. at 103-04).  This hearing was held on March 6, 2006, (see id. at 35), and, in a decision dated May 31, 2006, the ALJ concluded that the plaintiff was not entitled to disability insurance benefits or SSI benefits, (see id. at 21-34).  In reaching this conclusion, the ALJ made the following findings:

1. The Claimant met the special earnings requirements under Title II of the Social Security Act, as amended, on November 4, 2002, the date he stated he became unable to work, and continued to meet them through March 25, 2005, but not thereafter.

2. The Claimant has not performed substantial and gainful work activity since November 4, 2002.

3. The record establishes that the Claimant has the following medically determinable impairments that have imposed more than slight limitations upon his ability to function: insulin-dependent diabetes mellitus with diabetic neuropathy and retinopathy, and hypertension.

4. The Claimant's medically determinable impairments, either singly or collectively, have not revealed the same or equivalent attendant medical findings as are recited in Appendix 1 to Subpart P of the Social Security Administrations Regulations No. 4.  Furthermore, while such impairments have imposed limitations upon his ability to perform basic work-related functions, the Claimant can occasionally lift/carry items weighing up to 20 pounds; frequently lift/carry items weighing up to 10 pounds; sit for 6 hours during an 8-hour workday; stand/walk for 6 hours during an 8-hour workday; frequently bend, squat, stoop and kneel; and frequently use his hands for reaching, handling, feeling and fingering.  However, he would have to avoid exposure to temperature extremes, and environmental irritants including fumes, odors and gases.

5. In view of the above, the Claimant is unable to perform his past relevant work as a steel worker, bus driver, janitor and general laborer.

6. Notwithstanding the exertional and non-exertional limitations resulting from his medically determinable impairments, the Claimant possesses the

2

residual functional capacity for other work that exists in the regional and national economies in significant numbers.

7.  The Claimant's testimony, insofar as it attempted to establish total disability, was not credible in view of the criteria set forth under 20 CFR 404.1529 and 20 CFR 416.929, Social Security Ruling 96-7p, and <u>Polaski v. Heckler</u>, supra.

8.  Accordingly, the Claimant is not disabled, as that term is defined under the Social Security Act, as amended.

9.  The Claimant is not entitled to a period of disability or to the payment of disability insurance benefits under Title II of the Social Security Act, as amended.

10.  The Claimant is not eligible for the payment of supplemental security income benefits under Title XVI of the Social Security Act, as amended.

(Tr. at 32-33.)

The plaintiff requested that the Appeals Council of the Social Security Administration review the ALJ's decision.  (<u>See</u> Tr. at 17-18.)  This request was denied, (<u>see</u> <u>id.</u> at 9-12), and, therefore, the ALJ's decision stands as the final decision of the Commissioner of Social Security.

On January 9, 2007, the plaintiff filed the instant action.  (<u>See</u> Compl., filing 1.)  The plaintiff seeks a determination that the Commissioner's decision is erroneous.  (<u>See</u> <u>id.</u> at 3.)


## II.   STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings."  <u>Johnson v. Chater</u>, 108 F.3d 178, 179 (8th Cir. 1997) (quoting <u>Clark v. Chater</u>, 75 F.3d 414, 416 (8th Cir. 1996)).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion."  <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002) (quoting <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001)); <u>see also</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  The decision should not be reversed "merely because substantial evidence would have supported an opposite conclusion."  <u>Harris v. Shalala</u>, 45 F.3d 1190, 1193 (8th Cir. 1995)

(citation omitted).  However, the court's review is not simply "a rubber stamp for the [Commissioner's] decision and involves more than a search for evidence supporting the [Commissioner's] findings."  Tome v. Schweiker, 724 F.2d 711, 713 (8th Cir. 1984).  See also Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999) ("To determine whether existing evidence is substantial, 'we must consider evidence that detracts from the [Commissioner's] decision as well as evidence that supports it.'" (quoting Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993))).

I must also determine whether the Commissioner applied the proper legal standards to arrive at his decision.  See Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Nettles v. Schweiker, 714 F.2d 833, 835-36 (8th Cir. 1983).  No deference is owed to the Commissioner's legal conclusions.  See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

An ALJ is required to follow a five-step sequential analysis to determine whether an individual claimant is disabled.  See 20 C.F.R. § 404.1520(a); id. § 416.920(a).  The ALJ continues the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five.  See 20 C.F.R. § 404.1520(a); id. § 416.920(a).  Step one requires the ALJ to determine whether the claimant is currently engaged in any substantial gainful activity.  See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b).  If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b).  Step two requires the ALJ to determine whether the claimant has an impairment or a combination of impairments that significantly limits her ability to do "basic work activities" and satisfies the "duration requirement."  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."); id. § 416.920(a)(4)(ii), (c); id. § 416.909.  Basic work activities include, inter alia, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations," and "[d]ealing with changes in a routine

4

work setting." 20 C.F.R. § 404.1521(b); id. § 416.921(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 416.920(a)(4)(ii), (c).  Step three requires the ALJ to compare the claimant's impairment or combination of impairments to a list of impairments.  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii).  If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled."  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii).  If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.  See 20 C.F.R. § 404.1520(a); id. § 416.920(a).  Step four requires the ALJ to consider the claimant's residual functional capacity[1] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work."  See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f); id. § 416.920(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv), (f); id. § 416.920(a)(4)(iv), (f).  Step five requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which the claimant has done in the past.  See 20 C.F.R. § 404.1520(a)(4)(v); id. § 416.920(a)(4)(v).  If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five.  See 20 C.F.R. § 404.1520(a)(4)(v); id. § 416.920(a)(4)(v).

"In order to qualify for disability benefits, a claimant bears the burden of proving that he or she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death."  Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983).  However, at step five of the sequential analysis described above, the burden shifts to the Commissioner to establish that the claimant has the residual functional capacity to do "some job that exists in the national economy."  Id.  See also Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).

---

[1]"'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments."  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).  See also 20 C.F.R. § 416.945(a).

In this case, the ALJ reached step five of the sequential analysis and concluded that the plaintiff was not disabled. (See Tr. at 32-33 ¶¶ 6, 8.)

### III.   SUMMARY OF THE PLAINTIFF'S MEDICAL HISTORY

The plaintiff was born on September 21, 1959. (See, e.g., Tr. at 125.) Psychological tests administered during the plaintiff's seventh-grade school year indicate that the plaintiff's reading and arithmetic abilities reached only first- and third-grade levels, respectively. (See id. at 443-44.) In light of these scores, it was suggested that the plaintiff complete remedial work. (See id. at 443.) There is no indication, however, that the plaintiff received this remedial instruction: he stopped attending school at age fourteen or fifteen–before entering high school–and he has not earned a "GED." (Id. at 41.)[2] There is evidence that the plaintiff entered military service and completed training as a diesel mechanic, though the dates of his service are unclear. (See id. at 44, 52.)

On September 25, 2001, the plaintiff appeared at the Douglas County Hospital Primary Health Care Clinic (the Clinic) with complaints of perineal pain, lower abdominal pain, and "sharp twinge-like pain and numbness" in his feet. (Tr. at 292.) He was diagnosed with a history of diabetes and hypertension, probable peripheral neuropathy, and prostatitis. (Id.)[3]

On August 16, 2002, the plaintiff was admitted to the emergency room at the Creighton University Medical Center (the emergency room), where he received treatment for "uncontrolled hyperglycemia." (Tr. at 254; see also id. at 253-65.) He was discharged in "stable" condition in the early morning hours of August 17, 2002. (See id. at 256, 258.)

─────────────────────────────

[2]Records concerning the plaintiff's educational background contain inconsistencies. The plaintiff testified that he "didn't make it to high school." (Tr. at 41.) Medical records indicate that in 2004, the plaintiff reported having an eleventh-grade education. (See id. at 307.) In 2006, however, he reported that he dropped out of school in the ninth grade. (See id. at 394.) The school records included in the transcript do not seem to show evidence of formal education beyond grade six or seven. (See id. at 440-44.) The ALJ found that the plaintiff "has completed the 9th grade of school." (See id. at 25.)

[3]Medical Progress Notes indicate that the plaintiff returned to the Clinic a number of times between October 2001 and January 2004 to present various medical complaints and to seek refills of prescription medication. (See id. at 285-86, 290-91.)

Dr. Kenneth Blad examined the plaintiff on May 12, 2003.  (See Tr. at 268.)  The plaintiff told Dr. Blad that he had been experiencing pain in his legs for the past six or seven years and that "his two other main problems are diabetes and hypertension."  (See id.)  The plaintiff added that he had not taken any medications or checked his blood sugar levels for "months."  (Id. at 269.)  After examining the plaintiff, Dr. Blad determined that the plaintiff suffered from diabetes mellitus, hypertension, bilateral leg pain of unclear origin, right shin ulceration, possible diabetic retinopathy, possible peripheral vascular disease, and keloid scar formation.  (See id. at 272-73.)  He added that the plaintiff should seek follow up care from his primary care physician and an ophthalmologist, and that "it would be beneficial to his health" to stop using IV drugs.  (See id. at 273.)

On October 31, 2003, the plaintiff received treatment at the emergency room for an abscess on this left forearm, which developed after the plaintiff injected cocaine.  (See Tr. at 324, 328.)  The plaintiff was discharged in stable condition with instructions to return in two days "to have the packing removed."  (Id. at 324.)  On November 2, 2003, the plaintiff returned to the emergency room for a "wound check," (id. at 331), and he reported that his lack of funds prevented him from filling his prescription for antibiotics, (see id. at 332).  He was discharged in "good" condition, but he was instructed to start taking the antibiotics and to "watch for signs of infection."  (Id. at 329, 330.)

Dr. Nicole Anderson examined the plaintiff on August 28, 2004.  (See Tr. at 305.)  The plaintiff told Dr. Anderson that he felt pain in his legs and that walking one or two blocks caused him to suffer wheezing and shortness of breath.  (See id.)  He stated that "[h]e believes that the pain and shortness of breath is better when he is lying down and becomes worse when he is actively moving," and he added that "his ability to function at home" is limited because "he gets out of breath when doing activities and his legs hurt all the time."  (Id. at 306.)  He also stated that these conditions "limit[] his ability to work because he has been a manual labor [sic] most of his life," and that "he has the most difficulty with his lifting, carrying, and climbing because of leg pain."  (Id.)  Stooping and kneeling also caused him "trouble."  (Id.)  "He estimate[d] that he can sit approximately 30 minutes, stand 30 minutes, [and] walk approximately one to two blocks" before his leg pain forces him to lie down.  (Id.)  He also estimated "that he can lift

7

approximately 20 pounds." (Id.) Dr. Anderson's summary of the plaintiff's social history states,

> He currently does not work.  The last time he worked was at Paxton Mitchell in
> 2001 as a steel mill worker and quit because of pain in his legs.  He does not want
> to begin to work again and has not tried to find work.  In general, the work that he
> has done most of his life is hard labor.  He is a mechanic by trade and has worked
> in steel mills, janitorial work, and concrete.

(Id. at 307) The plaintiff also reported that he "has a girlfriend who comes over and takes care of

his household chores." (Id.) In addition, Dr. Anderson noted that the plaintiff was "unable to fill

out his questionnaire because he cannot write." (Id.) She added, "He has difficulty reading and

writing." (Id.)

Dr. Anderson's report states that the plaintiff "appeared comfortable" during the

examination. (Tr. at 309.) She observed that the plaintiff "sat continuously for 15 minutes" and

had "no pain behavior," and that he walked, "got on and off the table, [got] up and down from a

chair, [and moved] to and from the exam room without difficulty." (Id.) She noted, however,

that the plaintiff had "[d]ecreased sensation to fine touch and temperature in the legs and feet"

and "tenderness to palpation of the legs to approximately the mid calf region." (Id. at 311.) Dr.

Anderson diagnosed the plaintiff with diabetic neuropathy, uncontrolled diabetes, diabetic

retinopathy, and possible asthma. (Tr. at 312.) Her report concludes with the following

discussion:

> At this time, the claimant has no obvious disability in performing activities
> such as sitting, standing, walking, lifting, bending, twisting, hearing, climbing,
> [and] crawling from a range of motion standpoint.  However, he does have
> demonstrated pain consistent with a neuropathy, likely due to diabetes on exam
> today, which make[s] it difficult for him to walk long distances.  His ability to
> handle objects seems to be intact and although his sight is diminished somewhat with his
> retinopathy, his hearing and speaking abilities are intact, and he is actually a very
> personable gentleman and would do well in a social type situation where he could talk
> with people.  His ability to understand, carry out, and remember instructions and respond
> appropriately to supervision is intact.  He did not need any assistive devices today.
> Would benefit from formal pulmonary testing with possibility of COPD versus asthma as
> he did have significant wheezes today on his physical exam.

(Tr. at 312-13.)

In February 2004, the plaintiff appeared at the Clinic with complaints of leg pain. (See

Tr. at 360.) Progress notes indicate that the plaintiff returned to the Clinic a number of times

throughout 2004, 2005, and 2006.  (See id. at 343-44, 348, 351, 354, 357-58, 403-06.)  Although one record describes the plaintiff's treatment compliance as "blatantly terrible," (see id. at 348), two forms signed by "medical practitioners" on July 22, 2005, and August 7, 2006, respectively, indicate that the plaintiff's impairments prevent him from working, (id. at 416-17).[4]

Beverly A. Doyle, Ph.D., performed a psychological evaluation of the plaintiff on October 16, 2006, "as part of a disability determination."  (See Tr. at 394.)  During the evaluation, the plaintiff told Dr. Doyle that he was "raised by an adoptive family until he was in the ninth grade," when he dropped out of school.  (Id.)  Although the plaintiff stated that he had "behavioral problems" and "problems learning" during his school years, he denied receiving "special education."  (Id.)  He also reported that he was no longer using drugs and that he "presently only drinks one or two drinks a week."  (Id.)

The plaintiff told Dr. Doyle "that he has suffered from depression and anxiety for the past five years." (Tr. at 394.)  He added that "[h]e was beaten by several men and sustained severe injuries, and as a result he has flashbacks of this attack."  (Id.)  "He also has panic attacks when something out of the ordinary happens or does not go as expected."  (Id. at 395.)  During the evaluation, Dr. Doyle noted that the plaintiff "had a tremor in his legs."  (See id. at 394; see also id. at 395 ("While being interviewed, Terry had a tremor which he said started because he wasn't picked up for the appointment by his daughter as planned.").)  "He said that at times he gets so upset he gets dizzy and has to sit or lay [sic] down."  (Id. at 395.)

Dr. Doyle tested the plaintiff's "academic skill levels" using "the Wide Range Achievement Test."  (Tr. at 395.)  The plaintiff's scores placed his reading at the third-grade level, his spelling at the first-grade level, and his arithmetic at the third-grade level.  (See id.)  Dr. Doyle noted that "[a]ll [the plaintiff's] skills are significantly delayed," and that the plaintiff "is functionally illiterate."  (Id.)  Using the "DSM Multiaxial Classification" system, Dr. Doyle diagnosed the plaintiff as follows: Axis I - Dysthymic Disorder and Posttraumatic Stress Disorder; Axis II - Reading Disorder, Mathematics Disorder, and Disorder of Written Expression; Axis IV - "Problems related to social, environmental, educational problems,

---

[4]The defendant states that these "medical practitioners" are "medical providers from the Clinic."  (See Def.'s Br., filing 15, at 4.)

economic problems, health care"; and Axis V - "GAF-45."[5]  (Id. at 395-96.)  Dr. Doyle also
completed a "Mental Residual Functional Capacity Assessment" form, which addresses the
plaintiff's ability to perform unskilled work in light of his psychological impairments.  (See id. at
397-400.)  Dr. Doyle opined that the plaintiff had marked limitations in his abilities to deal with
work stress, to perform activities within a schedule, and to maintain concentration, persistence,
or pace.  (See id. at 397-99.)  In addition, she opined that he was moderately limited in his ability
to complete a normal workday, to accept instructions, and to respond to criticism.  (See id. at
397-98.)

        Floyd A. Jones, D.O., performed a "disability evaluation" of the plaintiff on October 23,
2006.  (See Tr. at 435.)  Dr. Jones noted that the plaintiff's medical history includes a broken
jaw, a tracheostomy, hepatitis C, bilateral hernia repair, diabetes mellitus, diabetic retinopathy,
"terrible gum disease" with multiple tooth extractions, frequent respiratory infections, dyspepsia,
pyrosis, and chronic leg pain.  (See id. at 435-36.)  Dr. Jones diagnosed the plaintiff with diabetes
mellitus - II with diabetic neuropathy, diabetic retinopathy, and COPD[6] of an undetermined type.
(Id. at 437.)  His report concludes with the following discussion:

        I think [the plaintiff] would have a very difficult time doing any lifting,
        pushing or pulling, doing any heavy lifting, carrying, bending or twisting.  He
        certainly could not climb or crawl.  If he could find work he would have to change
        positions frequently.  He can communicate well.  He can hear, talk and is very
        gregarious.  He states that he is a quick learner after he has been shown what to
        do.

        I do feel that he has mistreated his body for a number of years and he is
        paying the consequences at this time and he continues to drink and smoke and
        states that he no longer uses drugs and has not done so for at least two years.

        . . . I do not think he could do light work because I don't think he has the

_____

        [5]The parties are in agreement that a GAF of 45 reflects "serious symptoms (e.g., suicidal
ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social,
occupational, or school functioning (e.g., no friends, unable to keep a job)."  (See Pl.'s Br., filing
11, App. at 1; Def.'s Br., filing 15, at 5 n.2.)

        [6]COPD is an "[a]bbreviation for chronic obstructive pulmonary disease."  Stedman's
Medical Dictionary 407 (27th ed. 2000).

ability to do a good deal of walking or standing.  He would not be able to use leg
or foot controls and he is not able to stand or walk for 6 hours in an 8 hour work
day.  I do feel that he could probably do some sedentary work if it could be found
for a man of his limited education and inability to read and write.  He would have
to change positions frequently.

(Id. at 438.)

At the hearing before the ALJ, the plaintiff testified that his diabetes was under control,
but that he still experienced pain and numbness in his legs and hands.  (See, e.g., Tr. at 48, 53,
61-67.)  He added that he "cramp[s] up a lot."  (Id. at 53; see also id. at 62.)  He stated that
although he is able to do chores in his home, he must take frequent breaks because he feels tired,
his breath becomes short, and his legs bother him.  (See id.)  He also stated that he could neither
stand nor sit for long periods of time.  (See id. at 55-57.)  On a bad day, he can only sit or stand
for fifteen to twenty minutes before he is forced to lie down.  (See id. at 58.)


## IV.   ANALYSIS

The plaintiff submits several arguments in support of his claim that the Commissioner's
decision must be reversed.  (See Pl.'s Br., filing 11, at 7-17.)  My analysis of each of these
arguments is set forth below.


### A.   Whether the Vocational Expert Committed Errors that Require Reversal of the Commissioner's Decision

The ALJ concluded that although the plaintiff could not do his past relevant work, he
could perform jobs that exist in significant numbers in the regional and national economies.  (See
Tr. at 30-31, 32.)  The ALJ's conclusion was based, in part, on the testimony of a Vocational
Expert (VE).  (See id. at 31.)  The plaintiff submits that because the VE's testimony was
inaccurate and incomplete, the ALJ's decision is not supported by substantial evidence.  (See
Pl.'s Br., filing 11, at 8-10.)  This relatively broad assertion is supported by three specific
arguments.  I shall consider each of these arguments in turn.

First, the plaintiff argues that the VE's testimony concerning the plaintiff's ability to
perform certain jobs cannot support the Commissioner's decision because the testimony is in

11

conflict with the Dictionary of Occupational Titles (DOT).  (See Pl.'s Br., filing 11, at 8.)  I
disagree.

The VE testified that someone with the plaintiff's residual functional capacity could
perform the following unskilled "light" or "sedentary" jobs:

> There would be a hand packagers in the light range of skills.  For the State of
> Nebraska, Iowa and South Dakota there'd be approximately 5,800 [jobs].
> Nationally there'd be approximately 600,000.  There would be machine feeder in
> the light range of exertion.  There'd be approximately 900 in the State of Iowa,
> Nebraska and South Dakota.  Nationally, approximately 36,000.  There would be
> sorters in the light range.  Approximately 1,600 in the three state area.  And
> nationally there'd be 3,000.[7]
>
> . . . .
>
> There would be assembler in the sedentary range.  For the three state area,
> again, there would be approximately 2,300.  Nationally 104,000. . . .  There would
> be, inspectors, production inspectors.  In the sedentary range there'd be
> approximately 400, nationally 1,400.  There would be sedentary sorter,
> approximately 180 in the three state area and nationally 4,700.

(Tr. at 70-72.)  The VE also testified that the plaintiff could perform 65% of all unskilled light
work and 30% of all unskilled sedentary work.  (See id. at 71-72.)

The plaintiff argues that the Commissioner cannot rely upon the VE's testimony that the
plaintiff could work as a hand packager or machine feeder because, according to the Dictionary
of Occupational Titles (DOT), those jobs are classified "in the medium physical demand
category."  (See Pl.'s Br., filing 11, at 8; Tr. at 418.)  See also U.S. Dep't of Labor, Dictionary of
Occupational Titles §§ 920.587-018, 699.686-010 (1991).  It is true that the jobs of hand
packager and machine feeder are classified as medium work, and that the physical demands of
medium work "are in excess of those for light work."  See id., App. C, Part IV.  It is also true that
"an ALJ cannot rely on expert testimony that conflicts with the job classifications in the DOT
unless there is evidence in the record to rebut those classifications."  Jones ex rel. Morris v.
Barnhart, 315 F.3d 974, 979 (8th Cir. 2003) (citing Porch v. Chater, 115 F.3d 567, 572 (8th Cir.

---

[7]According to the hearing transcript, VE testified that there were 3,000 light sorter jobs in
the national economy.  The ALJ's opinion, however, states that the VE testified that there are, in
fact, 53,000 such jobs.  (Compare Tr. at 31 with id. at 71.)

1997)).  See also SSR 00-4p.  At first blush, it may seem as if the VE's testimony that the plaintiff–who is limited to unskilled light or sedentary work–could perform the jobs of hand packager and machine feeder conflicts with the job classifications in the DOT.  However, even though the jobs of hand packager and machine feeder are classified generally as medium work, it does not follow that all hand packager and machine feeder jobs amount to medium work.  Indeed, it is well-established that "a DOT definition of a particular job represents only the 'approximate maximum requirement for each position, rather than [the] range.'" Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996) (quoting Jones v. Chater, 72 F.3d 81, 82 (1995)).  See also Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000).  Here, the ALJ asked the VE to "identify any unskilled light or sedentary work that someone of [the plaintiff's] vocational profile, with this functional capacity could perform," (Tr. at 70 (emphasis added)), and the VE responded that there are a specific number of hand packager and machine feeder positions that fall within the category of light work.  Because the VE's testimony was limited to those positions that fall within the plaintiff's residual functional capacity, it was not error for the ALJ to rely upon that testimony.

Next, the plaintiff argues that the VE's failure to provide "DOT codes or job descriptions for any of the occupations cited" frustrates meaningful review of the Commissioner's decision. (Pl.'s Br., filing 11, at 8; see also Pl.'s Reply Br., filing 16, at 1.)  More specifically, the plaintiff suggests that the VE's failure to provide DOT codes or job descriptions violates SSR 83-14 and SSR 85-15, though he does not identify particular language within these rulings that might be implicated in this case.  (See Pl.'s Reply Br., filing 16, at 1.)  SSR 83-14 states, "Whenever a vocational resource is used and an individual in found to be not disabled, the determination or decision will include (1) citations of examples of occupations/jobs the person can do functionally and vocationally and (2) a statement of the incidence of such work in the region in which the individual resides or in several regions of the country."  SSR 85-15 contains similar language. Neither ruling, however, requires a VE to present specific DOT codes or job descriptions to the decision maker.  I am not persuaded that the VE's failure to cite DOT codes or job descriptions for the positions she identified requires a remand.

Finally, the plaintiff argues that the occupations cited by the VE "are well beyond

13

Plaintiff's reasoning and language abilities." (Pl.'s Br., filing 11, at 8-9.) More specifically, the plaintiff claims that the DOT's "GED" scores[8] for the jobs identified by the VE place those jobs beyond the range of the plaintiff's capabilities because 1) when the plaintiff was in seventh grade (in 1973), he was referred for a psychological evaluation after it was determined that his "[a]chievement [was] very poor" and that he would "not be able to do regular class work," (see Pl.'s Br., filing 11, at 9; see also Tr. at 443); and 2) during the course of this evaluation, the plaintiff's reading and arithmetic skills were assessed at the first- and third-grade levels, respectively, (see Pl.'s Br., filing 11, at 9; Tr. at 443). I note in passing that the plaintiff was retested in 2006, and on this occasion his arithmetic, reading, and spelling skills were assessed at the third-, third-, and first-grade levels, respectively. (See Tr. at 395.)

The plaintiff's argument depends upon an assumption that the ALJ's determination that the plaintiff possesses a "limited education" is not supported by substantial evidence. (See Tr. at 69 (indicating that the ALJ found the plaintiff to have "a limited education").)[9] The regulations define "limited education" as follows:

> Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through 11th grade level of formal education is a limited education.

20 C.F.R. § 404.1564(b)(3); id. § 416.964(b)(3). The ALJ's determination that the plaintiff completed the ninth grade, (see Tr. at 25), is consistent with a finding that the plaintiff possesses

---

[8]As it is used here, the term "GED," or General Educational Development, refers to "those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." U.S. Dep't of Labor, Dictionary of Occupational Titles, App. C, Pt. III (1991). "The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development." Id.

[9]This is so because the unskilled light and sedentary jobs cited by the VE would be within the plaintiff's educational abilities if the plaintiff has a "limited education" as the term is defined in 20 C.F.R. § 404.1564(b)(3) and 20 C.F.R. § 416.964(b)(3). I note in passing that the plaintiff does argue that the ALJ's assessment of his education is not supported by substantial evidence, though this argument appears in later sections of his brief. (See, e.g., Pl.'s Br., filing 11, at 10-11, 12.)

a "limited education."  The regulations provide, however, that "the numerical grade level that you completed in school may not represent your actual educational abilities," and that the numerical grade level will be used to determine a claimant's educational abilities "if there is no other evidence to contradict it."   20 C.F.R. § 404.1564(b); id. § 416.964(b).  In this case, the record contains evidence that contradicts the use of the plaintiff's numerical grade level to determine his educational abilities.  Indeed, in light of the plaintiff's 1973 and 2006 assessment scores, the school record indicating that the plaintiff would not be able to do regular seventh-grade work, and several references to the plaintiff's "functional illiteracy" and use of assistance to complete paperwork, (see Tr. at 189, 199, 249, 307, 395, 437-38),  I find that the ALJ's conclusion that the plaintiff possessed a "limited education" is not supported by substantial evidence.[10]

In opposition to the plaintiff's argument, the Commissioner does not claim that the ALJ's decision was supported by substantial evidence.  Instead, he argues that even if the plaintiff is correct, "there is no error."  (Def.'s Br., filing 15, at 14; see also id. at 9.)[11]  Specifically, the Commissioner submits that because the VE "testified that a person with the plaintiff's limitations, education, and experience could perform approximately 65% of unskilled light jobs," and because "the regulations state that the bulk of unskilled light work can be performed by people who are illiterate," "there are clearly a significant number of jobs that Plaintiff can perform."  (Id. at 14.)  The regulation relied upon by the Commissioner states,

While illiteracy or the inability to communicate in English may

---

[10]It should be noted that most of this evidence was not presented to the ALJ, but was submitted to the Appeals Council after the ALJ reached her decision in the plaintiff's case. However, because the Appeals Council considered the plaintiff's new evidence, I am required to decide "whether the administrative law judge's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made."  Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994).

[11]To be precise, the Commissioner claims that even if the plaintiff is correct that "the jobs cited by the vocational expert are outside of his reasoning and language abilities," "there is no error."  (Def.'s Br., filing 15, at 14.)  On the contrary, it seems to me that if the plaintiff is correct that the jobs cited by the VE are beyond his reasoning and language abilities, the Commissioner has failed to satisfy his burden at step five of the sequential analysis.

significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance. . . .  The capability for light work, which includes the ability to do sedentary work, represents the capability for substantial numbers of such jobs.  This, in turn, represents substantial vocational scope for younger individuals (age 18-49) even if illiterate or unable to communicate in English.

20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.00(g).  In essence, the regulation stands for the proposition that there is a substantial amount of unskilled work available for illiterate persons who can perform light work, "which includes the ability to do sedentary work."  Here, however, the plaintiff was found to be capable of performing only 65% of the range of unskilled light work and 30% of the range of unskilled sedentary work, even though the ALJ's hypothetical questions to the VE involved a person with a limited education as opposed to an illiterate person.  (See Tr. at 69); compare 20 C.F.R. § 404.1564(b)(1) and id. § 416.964(b)(1) with id. § 404.1564(b)(3) and id. § 416.964(b)(3).  The ALJ found that the plaintiff's "occupational base for even sedentary work has been eroded by the fact that he would have to avoid exposure to temperature extremes . . . and environmental irritants including fumes, odors, and gases."  (Tr. at 31.)  Section 202.00(g) does not foreclose the possibility that a finding that the plaintiff is illiterate could erode the range of relevant work still further–perhaps even to the point that the Commissioner is unable to satisfy her burden at step five of the sequential analysis.

I note too that if the plaintiff is "illiterate" within the meaning of the regulations, it is not clear whether he can perform any of the jobs identified by the VE.  The regulations define "illiteracy" as follows:

(1) Illiteracy.  Illiteracy means the inability to read or write.  We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  Generally, an illiterate person has had little or no formal schooling.

20 C.F.R. § 404.1564(b)(1); id. § 416.964(b)(1).  There seems to be no dispute that the jobs cited by the VE require at least Language Development Level 1 on the GED Scale.  (See Pl.'s Br., filing 11, App. at 2-9.)  Language Development Level 1 is defined, in part, as follows:

Reading: Recognize meaning of 2,500 (two- or three-syllable) words.
Read at rate of 95-120 words per minute.  Compare similarities and differences

between words and between series of numbers.

       Writing: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

U.S. Dep't of Labor, Dictionary of Occupational Titles, App. C, Pt. III (1991).  A person who satisfies the foregoing definition of illiteracy would not appear to have the capabilities associated with Language Development Level 1, though it must be recalled that the DOT definitions represent approximate <u>maximum</u> requirements.  <u>See</u> <u>Wheeler v. Apfel</u>, 224 F.3d 891, 897 (8th Cir. 2000).  In short, if the plaintiff is indeed illiterate, it is not clear whether the Commissioner has identified any specific job that the plaintiff is capable of performing.  Under these circumstances, I cannot agree with the defendant's suggestion that the plaintiff's literacy is irrelevant in this case.

       In summary, I find that the ALJ's determination that the plaintiff possessed a limited education is not supported by substantial evidence, and I must reject the Commissioner's argument that the ALJ's error is harmless.  Therefore, I find that this case must be remanded to the Commissioner for an evaluation of the plaintiff's education and a determination of whether the plaintiff can perform work other than his past relevant work.[12]

    **B.**    **Whether the Social Security Administration Failed to Consider New, Material Evidence**

       The plaintiff argues next that the Appeals Council failed to consider properly the new evidence that the plaintiff submitted after the ALJ issued an opinion in his case.  (<u>See</u> Pl.'s Br., filing 11, at 10-11.)  Much of the new evidence submitted by the plaintiff concerns his education or illiteracy.  (<u>See</u> <u>id.</u>)  In light of my determination that the case must be remanded for an evaluation of the plaintiff's education, the plaintiff's argument is moot insofar as it applies to this

---

[12]I note in passing that after the Appeals Council considered the plaintiff's request for a review of the ALJ's decision, the Council determined that "there is no indication [that the plaintiff is] completely illiterate as defined by the inability to read and write."  (Tr. at 10 (citing 20 C.F.R. § 404.1564(b)(1); <u>id.</u> § 416.964(b)(1).)  The Commissioner has not argued, however, that this determination was supported by substantial evidence, and I express no opinion on that point.

evidence.

The plaintiff also claims, however, that the Appeals Council did not properly consider evidence of the plaintiff's depression and anxiety, the opinions of "treating physicians," and a report from Dr. Jones.  (See id.)  I disagree.  The Appeals Council considered this evidence and explained its reasons for discounting it.  (See Tr. at 10.)  Under these circumstances, my "role is limited to deciding whether the administrative law judge's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made."  Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994).  This "means that [I] must speculate to some extent on how the administrative law judge would have weighed the newly submitted [evidence] if [it] had been available for the original hearing," which is a "peculiar task for a reviewing court."  Id.  Nevertheless, for the following reasons, I find that the Appeals Council gave due consideration to the evidence and that the ALJ would have discounted the evidence if it had been placed before her.

First, I note that the Appeals Council determined that evidence of the plaintiff's "dysthymic disorder and . . . posttraumatic stress disorder," which appears in the report of Dr. Doyle, is entitled to little weight because 1) the report "is based on a one-time snapshot evaluation, which in turn is based mainly on [the plaintiff's] own self-reported limitations," and 2) "[t]here is no evidence in the record [that the plaintiff has] ever received treatment for psychological problems."  (Tr. at 10.)  This determination was appropriate, and it is likely that the ALJ would have discounted it for the same reasons.  See, e.g., Kelly v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("The opinion of a consulting physician who examines a claimant once . . . does not generally constitute substantial evidence."); Riley, 18 F.3d at 622 (citing Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991)) (holding that the opinion of a consulting examiner who saw the claimant only once, and whose opinion is in conflict with other evidence in the record, may be given less weight);[13] Conklin v. Barnhart, 206 F. App'x 633, 637 (8th Cir. 2006) ("Given the fact that the ALJ had already properly discounted [the claimant's] subjective claims,

_____

[13]I note parenthetically that Dr. Doyle's opinion that the plaintiff suffered from mental illness is inconsistent with Dr. Anderson's mental status assessment.  (See Tr. at 311 ("Affect, thought content, judgment, and calculation are intact with no obvious signs of mental illness.").)

the ALJ did not err in discounting a medical assessment relying on them.").

Second, the physician statements from the Douglas County Department of General Assistance are conclusory, and the physicians' opinions that the plaintiff's "diagnosis prevent[s] the [plaintiff] from working," (Tr. at 416, 417), "are not medical opinions that should be credited," Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). As a result, this evidence is entitled to little, if any, weight.

Finally, Dr. Jones' report stating that the plaintiff "would have a very difficult time . . . lifting, pushing[,] pulling, doing any heavy lifting, carrying, bending, or twisting," and would be unable to "climb or crawl," (Tr. at 438), is not supported by objective findings stemming from his examination of the plaintiff, (see id. at 437), but instead appears to be based solely on the plaintiff's subjective complaints. Because the ALJ determined that the plaintiff's testimony concerning the severity of his subjective complaints was not credible, I have little doubt that the ALJ would have discounted Dr. Jones' opinion. See Conklin v. Barnhart, 206 F. App'x 633, 637 (8th Cir. 2006); Cf. Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993) (finding that ALJ's decision to discount treating physician's opinion of disability was justified, based in part upon the fact that the physician's opinion was based solely on claimant's subjective complaints of pain).

Setting aside the evidence concerning the plaintiff's education level, which should be considered on remand, I find that proper consideration was given to the "new" evidence submitted by the plaintiff to the Appeals Council.

**C.     Whether the Social Security Administration Failed to Develop the Record Regarding the Plaintiff's Mental Impairment**

The plaintiff argues that the case must be remanded for further consideration because the ALJ failed to develop the record with respect to the plaintiff's alleged mental impairment and illiteracy. (See Pl.'s Br., filing 11, at 11-13.) As I have already determined that the case must be remanded for reconsideration of the plaintiff's education level, (see supra Part IV.A), I shall proceed to analyze whether the case must be remanded for further development of the record with respect to the plaintiff's alleged mental impairment.

19

The plaintiff argues that Dr. Doyle's report, which was submitted to the Appeals Council after the ALJ issued her decision, "requires further development of the record" concerning the plaintiff's mental impairment.  (See Pl.'s Br., filing 11, at 12.)  "A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).  However, a remand is warranted only when the failure to develop the record is prejudicial.  Id. (citing Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995)).  "Without informing the court what additional medical evidence should be obtained . . . [the claimant] has failed to establish that the ALJ's alleged failure to fully develop the record resulted in prejudice, and has therefore provided no basis for remanding for additional evidence." Id.  Here, the plaintiff does not specify any additional evidence that, in his view, should be obtained.  Instead, he argues that in light of Dr. Doyle's report, the Commissioner's decision is not supported by substantial evidence.  Furthermore, he claims that "the ALJ decision cannot be found to be supported by substantial evidence without such further development."  (Pl.'s Br., filing 11, at 12.)  The question at hand, however, is whether the record concerning the plaintiff's mental impairment is inadequate and incomplete, such that a remand for further development of the record is in order.  The plaintiff has submitted his evidence of mental impairment; the Appeals Council considered this evidence and determined, appropriately, that it was entitled to little weight, (see supra Part IV.B); and the plaintiff has not identified any additional evidence that is necessary to permit a "proper" evaluation of his mental impairment.  A remand for further development of his alleged mental impairment is not warranted under these circumstances.

In addition, it must be noted that at the time of the hearing before the ALJ, the plaintiff made no claim that he suffered from a mental impairment, and the record contained no evidence that the plaintiff sought treatment for, or was diagnosed with, a mental impairment.  "[A]n ALJ is not obliged 'to investigate a claim not presented at the time of the application for benefits and not offered a the hearing as a basis for disability.'"  Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (quoting Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996)).  Thus, the ALJ did not err by failing to develop the record with respect to the plaintiff's alleged mental impairment.

### D.   Whether the ALJ's Residual Functional Capacity Assessment Was Supported By Substantial Evidence

The plaintiff argues next that the ALJ's assessment of his residual functional capacity (RFC) is not supported by substantial evidence.  (Pl.'s Br., filing 11, at 13-15.)  I disagree.

As noted above, a claimant's RFC refers to "the most [he] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1); id. § 416.945(a)(1).  The residual functional capacity assessment is used at the fourth step of the sequential evaluation process to determine if the claimant can return to his past relevant work and at the fifth step to determine if the plaintiff can adjust to other work.  See 20 C.F.R. § 404.1520(e); id. § 416.920(e).  "A disability claimant has the burden to establish [his] RFC."  Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  All relevant evidence is used to assess a claimant's RFC, "including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  Id.  A claimant's RFC is a medical question, however, and "'[s]ome medical evidence' must support the determination of the claimant's RFC."  Id. (quoting Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000)).

The plaintiff claims that the ALJ's RFC determination was not based upon medical evidence, but was based solely upon the findings of a "paper review physician."  (Pl.'s Br., filing 11, at 14.)  He also argues that the RFC determination cannot rest on the fact that none of the plaintiff's treating physicians placed any restrictions on his ability to function.  (See id. at 15.)  It is true that "[t]he opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole."  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  It is also true that when treating physicians have not been asked to express opinions about a claimant's ability to engage in work-related activities, the absence of opinions on this issue "does not constitute substantial evidence supporting the ALJ's findings."  Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir. 2001).  In this case, the ALJ did note that the "medical personnel who have treated Mr. Mitchell have placed no restrictions upon his ability to function," and that the opinions of "medical consultants employed by the DDS" supported her RFC assessment.  (Tr. at 29.)  She noted too, however, that her RFC assessment "was consistent with the opinions expressed by Dr. Anderson[,] who examined the Claimant in August 2004."  (Id.;

21

see also id. at 312 ("At this time, the claimant has no obvious disability in performing activities such as sitting, standing, walking, lifting, bending, twisting, hearing, climbing, [and] crawling from a range of motion standpoint.  However, he does have demonstrated pain consistent with neuropathy . . . which make[s] it difficult for him to walk long distances.").)  She also properly discredited the plaintiff's subjective complaints of pain.  (See Tr. at 27-30.)  In short, "the ALJ did not solely rely on the reviewing physicians in this case," Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995), or the absence of limitations imposed by treating physicians.  "The ALJ also conducted an independent analysis of the medical evidence," id., and I find that her RFC assessment is supported by substantial evidence.

    **E.**    **Whether the ALJ Submitted an Accurate Hypothetical Question to the VE**

Finally, the plaintiff argues that because the ALJ submitted a "defective hypothetical" to the VE, the VE's testimony does not amount to substantial evidence that the plaintiff can engage in substantial gainful employment other than his past relevant work.  (See Pl.'s Br., filing 11, at 15-17.)

Hypothetical questions are often posed to vocational experts in order to elicit testimony concerning the availability of jobs that a person with the claimant's RFC can perform.  Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998).  "The questions must fairly reflect the abilities and impairments of the claimant as evidenced in the record."  Id. (citation omitted).  If a hypothetical question does not include all of the claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability."  Id. (citation omitted).  In this case, because the ALJ's assessment of the plaintiff's education was not supported by substantial evidence, and because the Commissioner has failed to persuade me that this error was harmless, (see supra Part IV.A), the VE's testimony cannot support a finding of no disability.  Apart from the assessment of the plaintiff's education, however, I find that the remainder of the hypothetical question presented to the ALJ fairly reflects the abilities and impairments of the claimant as evidenced in the record.

**IT IS ORDERED** that the Commissioner of Social Security's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with the memorandum accompanying this order.

Dated July 30, 2007.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge